Good morning, Your Honors. Catherine Young from the Federal Public Defender's Office for Appellants, Kim Scovis. And I will try to reserve a few minutes for rebuttal. Ms. Scovis is appealing her conviction for theft of government property on November 27, 2016. She alleges individual and cumulative trial errors. I want to put in context some of those errors by briefly delving into the background of this case and the defense that she was not allowed to present. Kim was convicted based on the conduct of her mother, Mary. Mary went to Citibank on November 27, 2016. I thought her mother was Jenny. I'm sorry, Your Honor. I thought her mother was Jenny. I'm sorry, Your Honor. I was going to say Mary was her grandma. Sorry. Right. Absolutely. And that matters because, I mean, it matters for a lot of reasons. But I, well, go ahead. I mean, one of the things in looking directly at the checks last night that bothered me was that the checks from, I understand your argument is going to be that the checks from 2009 to 2010 shouldn't have come in, right? That the earlier checks should not have come in. Well, all of them. We agree that all of them should not have come in. All right. Four checks. All four checks. Yes, Your Honor. Go ahead. Sorry for the misstatement. Okay. So Kim accompanied her mother, Jenny. Jenny signed a small estate affidavit claiming she was entitled to the proceeds of Mary's account. Jenny closed Mary's account. And Jenny signed papers transferring the proceeds of Mary's account to a new joint account. The new joint account that Kim signed onto, correct? That's correct. Right. And then Kim made a $5,000 withdrawal from the account the next day or within a few days thereafter, correct? That's correct. Okay. And there's no dispute that that was her volitional act? There's no dispute that the next day, on November 28th, Kim made some withdrawals. Our position is that the ---- Three totaling $5,600 with a debit card, right? There were three withdrawals made by Kim on November 28th. Now, our position is that the offense was on November 27th and that the offense was concluded under the Wood case that we signed in our briefs on November 27th when the funds were withdrawn from Mary's account. Well, I understand that's your defense. Your defense is that the mother was the only one taking the money and then the offense ended. That's your defense. Correct. Well, if that's the defense, then why should we not have evidence about writing checks on the account? Well, because, first of all, the November 12th check, 2002. I mean, isn't it true that the checks from Mary's account to Kim Novis and endorsed by Kim provide evidence that she ---- well, at least evidence that she intended to steal money? No, absolutely not, Your Honor. There was evidence that Kim was not informed until January 2016 that there were Social Security proceeds in Mary's account. So anything before January 2016 is not proof of theft. At that point, she had been told by Mary, by Jenny, her mother, that the proceeds of Mary's account were an inheritance that belonged to Jenny alone and that Jenny had the right to that money as Mary sold it. Well, that's why I thought you had said, let's go back to the checks and what I was going to say about the checks. Those, the earlier checks, I guess all of the checks were signed Mary, right? That's correct. And then at least three of them were endorsed by Kim. Kim. So she ---- and this argument was never really made. It took a while to adorn to me. But she at least knew she was getting checks from her dead grandmother. That was because her mother, she was under the domination and control of her mother, Jenny. Jenny told her, I am in ---- Jenny showed her Mary's will giving all the proceeds of Mary's thing. Even so, her dead grandmother didn't sign the checks. No, but Kim believed that this was ---- that these were Jenny's proceeds. This was just Jenny's way of handling it. She had to know something was up because the checks were signed by her, purportedly by her dead grandmother, whoever signed them. Yes, but she believed ---- Jenny repeatedly told her that this, the money in Mary's account was an inheritance that belonged to Jenny. Fine. It was her money. Why is she signing it in the name of her dead grandmother? I think that's the way that they were handling the account at that time. Well, the problem comes in that when we're looking at this evidence, you're making the best argument you can for your side of the story with this evidence. But the bottom line is it's just as easy to suggest that Kim went in there, signed her grandma's name to accounts and signed the back of the check and took the money, knowing full well she was taking this money and knowing full well that she was getting away with money that Social Security put in there. Well, Your Honor, that's why it's so important in this case that Kim was precluded from presenting her defense. Well, but just a minute. First of all, you're saying is there sufficient evidence? So I'm trying to get to the sufficient evidence question. Then you're saying that the court erred in admitting the checks, and I'm saying to myself it seems to me that the checks come in because of what the checks would demonstrate. It doesn't come in ---- I mean, you can argue what you want about the checks, but I still don't know why the district court shouldn't have admitted them. They certainly were relevant, and they weren't prejudicial. Well, I disagree, Your Honor. I mean, I think they were prejudicial. Well, of course they were prejudicial in the sense that they tended to show ---- Well, wait a minute. I mean, they were prejudicial in the sense that they tended to show that at least as I'm looking at it that she knew there was something not right about this. I don't know that it shows that she knew it was Social Security money, but it shows that there was some reason that this account was being treated illegitimately in some fashion. It was dishonest to cash a check that was purportedly signed by a dead person that you knew was not signed by a dead person. Well, I think maybe dishonest is too strong, and I think all of this is why it's so important that the defense was precluded from putting on its case. Because if you put it in context that Kim was dominated by her mother, Jenny, that Jenny, as a Holocaust survivor, was extremely controlling, hid financial information from Kim, Jenny directed Kim what to do, and Kim did what Jenny told her to do without questioning, then you put in context why Kim would cash checks that had been signed by Mary. And Jenny was the daughter-in-law of Mary, correct? Yes. Yeah, okay. But the relationship between the two of them is important, and it was not allowed at trial, nor was it allowed at trial that Kim had actually notified her. What do you mean by the relationship wasn't allowed at trial? I mean, you didn't put on a defense, right? No. And one of the reasons is because so much was precluded that Kim was effectively precluded from testifying. Well, I understood the part about the fact that she says she did call Social Security, and it does seem to me that the record reads as if he said, nothing about this is coming in. You never made a proffer or anything for any evidence about it, but he did say nothing about it is coming in. Yes, Your Honor. So insofar as that is the crux of your argument, I understand it. I don't know entirely how it – how do you tie that up? Why does it matter? Well, it really matters, Your Honor, because it was the whole crux of her defense. She admitted that she was told in January 2016 that there were Social Security proceeds in the account. She then contacted the Social Security company repeatedly. She faxed information to them. She assumed that the area – Well, she said she did. She said she did. She said in some – but not at trial she didn't say she did. No, but that's in the agent's report. Okay. That she told the agent when she was interviewed by the agent. And she also said, I was told that Social Security had the wrong Social Security number for Mary. And that was confirmed by the government's Social Security witness at trial. So we know that Kim, in fact, did have some contact because she knew information that was confirmed at trial. Therefore – But she wasn't charged with not reporting the death. At least at trial she wasn't charged with it. No, but the reason that it's so important is because it explains why when she accompanied Mary in November 2016 to Citibank, she believed that there were no more Social Security proceeds in the account. She believed it had been corrected because she had dealt extensively with the Social Security Administration to correct this error. She believed then when she accompanied Mary that this – that the amount in Mary's – Did she say when she talked to the agent because she – I mean, since she didn't testify a proper testimony, we're kind of a little at sea in terms of what – Well, I think defense counsel – Just a minute. Sorry. So what – did she tell the agent that she had some reason to think they fixed it? I think she did not go that far. But the defense counsel in the passage that you're talking about where the court excluded evidence that Kim had notified Social Security, defense counsel made the argument that we really need this evidence. Repeatedly he told the court we need this evidence because if Kim notified Social Security, then there are inferences that follow from that, that Kim believed it had been corrected and Kim no longer believed there were Social Security proceeds in the account when she went to Citibank in November 2016. Which amounts to the fact – I mean, this is the problem, that she still knew it was her grandmother's account and that her grandmother had been dead for 10 years or something and that checks were being written under the account of the dead grandmother. So if it wasn't coming from Social Security, it was coming from some other illegitimate place, but it's a very technical defense, right? Well, I don't think it's a technical defense because Mary – Jenny told Kim that this was an inheritance that belonged to Jenny. Mary had Jenny's will leaving her entire – I didn't understand the inference of the will. I didn't understand what the relevance of it was. Because Kim believed that these were funds that belonged to Jenny and that when Jenny was withdrawing them from Mary's account rather than transferring the funds into Jenny's name, it was still Jenny's money. That's what Jenny told Kim. This is my money. It's an inheritance from my mother-in-law, Mary, and I'm giving it to you. You know, in writing the checks, Jenny was giving money that belonged to Jenny to Kim. Well, she knew that it had been – there was something sneaky, shaky about this account because it had been kept in her grandmother's name all these years and checks had been written in the name of her grandmother. I don't think it's necessarily something sneaky or shady. I think it's that if you consider the whole context of the relationship between Kim and Jenny and also the description of Jenny as a Holocaust survivor who was very secretive about money, who was holding on to money, who was concealing financial information from Kim, I think that in that context Jenny's not transferring the funds may not have seemed as unreasonable as it may seem to other people. How do you deal with the circumstance that the statements by Jenny that you wanted to offer were, in the course of an interview, basically one-word answers laid out in a submission to the court, no narrative, no context, and the law of this circuit is that family exculpatory statements are not highly reliable? Well, I think in those cases, Your Honor, there are cases where there's something inconsistent or contradictory about the exculpatory statements or the statements are actually not exculpatory. Like the brother says, I did it in self-defense, which is actually not inculpatory of the brother. Well, that's a different issue whether they're inculpatory or exculpatory. But even where they're exculpatory, they don't meet the reliability or they may not meet the reliability standard. And wasn't that a call by the trial judge, which is entitled to some deference? Well, I think there are cases that recite in the brief where if the statements are reliable, then the rule about family testimony not being necessarily reliable can be overcome by showing that the specific statements are reliable. Well, it's all part of the reliability and trustworthiness analysis. Exactly, Your Honor. In these cases, all of Jenny's statements were confirmed by the documents themselves. So we contend that they were reliable. We also contend that this Court and the district court was supposed to not consider just isolated evidentiary rules, but the picture of a whole as to whether Kim was granted her constitutional rights to present a defense and to present all the evidence in her case that showed the whole panoply of facts that made her defense relevant. And that was not considered by the district court. And these statements, I think, were relevant in and of themselves, but they were also important for their constitutional implications of granting Kim her right to present a defense. But you weren't urging any coercion or overcoming of Kim's will by Jenny, were you? No, I don't think so. I'm just talking about it would be important, I think, for the trier fact to know the history of the relationship between the mother and daughter, to fully understand. How was that supposed to come in? And what was not allowed about it? Well, that would have come in through Kim. But Kim didn't testify. Kim could have testified. No, but I think the ruling that the Court made saying Kim could not testify, that she had notified the Social Security. No, but what does that have to do with whether Kim could testify about that her mother was really the one who did all this and that she was just or that her mother was supervening and controlling? Because the point I'm trying to make is that this ruling effectively precluded Kim from testifying. Under this ruling, Kim would have taken the stand. She would have been asked, weren't you told to notify Social Security in January 2016? And she would have said yes. She wouldn't have been able to say, and yes, I did notify. Well, wait, the trial judge said if the door is open by the prosecution on cross-examination, you can't walk through that door. Was there any such ruling by the trial judge? I'm not sure. In other words, you're saying that what she feared was on cross-examination, the government would say, weren't you told to notify the Social Security Administration? And her answer would be yes. And then on redirect, you would be foreclosed from saying, but didn't you? Because of the judge's ruling, which related to the direct testimony of your client on her direct examination. The judge didn't address what happens if the government is foolish enough to ask a question that might open the door. No, I think the court did, Your Honor, because several times during that colloquy that started on ER-893, the government said, we intend to elicit that she was told to contact Social Security, but we object to testimony that she actually did contact Social Security as irrelevant. That happened several times. And repeatedly, defense counsel explained the drastic consequences that would have on Kim's ability to present her defense. And the court said, don't you understand? I ruled. Unless there are any further questions. Thank you very much.  Thank you. Good morning, Your Honors. May it please the court, Victoria Diktyarova on behalf of the United States. Could I impose on you to respond to that last point, the last discussion, that the district court judge allowed the unfair circumstances, circumstance of allowing the government to question as to whether she was told that she should inform Social Security, but could not if the government got an affirmative answer from her, her counsel could not bring out on redirect that she had done so. Is that an accurate statement of what the trial judge ruled? I do not believe that it is, Your Honor. The trial judge ruled on two very specific objections. First, the defense counsel attempted to elicit testimony from the government's first witness, the Social Security Administration employee, Cesar Gonzalez, that there were flaws in the Social Security databases, and asked two questions about the flaws in the Social Security databases. The court ruled that that was not relevant. Defense counsel further stated that he intended to question the case agent about her own attempts to notify the Social Security Administration. And the court then ruled on that specific objection. Now, in fact, when the defendant asked the court if the government would be allowed to elicit testimony regarding the Citibank employee's statements to the defendant that she needed to call the Social Security Administration, the court said that she has to object at the time that that testimony is elicited, and that's on page 898 of the excerpts of record. Now, at the time that the testimony was elicited, the defendant actually did not object. And as the court pointed out, the defendant never attempted to testify. She never – But it did appear that the second time this was discussed, the district court made a fairly generic statement about this is just not relevant. I'm not laying anything about it in. Your Honor, if the defendant had attempted to testify, and if what defense counsel said could transpire did, in fact, transpire, that the government asked the defendant, weren't you told that you had to notify the Social Security Administration, the district court's rulings on what could then be admitted may have been very different. But because that never happened, it's impossible to now determine how the district court would have actually ruled on this question that, again, was never brought before the district court. I don't – Well, as I understand it then, and this is why I was a little bit confused by what your opposition was saying, the district court really never directly ruled on what the defendant could testify to. The only thing that the district court did is the district court ruled on about the flaws in the record-keeping system and said that wasn't relevant at the time. It might have been in the future, but it wasn't at the time, and made one other objection as it relates to what could be asked of an agent about what the defendant had said and made a ruling there. But that's the best that there was here, right? That's exactly right, Your Honor. And, in fact, the defendant, regardless of this notification issue, the defendant could have testified about a number of issues that she says she was precluded from raising. For example, she could have testified about the allegedly controlling relationship with her mother. She could have testified that her mother told her the money in the account belonged to her, and that, in fact, would not have been hearsay because it would have been for the effect on the listener, which is defendant. She could have testified that she never saw the bank statements because her mother kept them from her. She could have attempted to allay an authentication for her grandmother's will by testifying, for example, that she recognized the grandmother's signature or she knew that the grandmother made a will. Because the only way that the will was going to get in was by somebody who couldn't get it in because no foundation, right? Yes, Your Honor, and the defendant chose not to testify and chose not to bring in any of this evidence that she could have brought in. There was a serious question, though, about whether all of the money in the account had come from Social Security. In fact, there had been about $125,000 deposited in the account. Why wasn't the defendant entitled to a subpoena directed to CalSTRS to see what in the account came from CalSTRS as distinguished from Social Security? Because there might be a question of whether the money that was withdrawn was CalSTRS money. Your Honor, I don't have the exact figures in front of me, but I believe that from the time that CalSTRS stopped depositing money in around 2009 until the time that the account was closed, Social Security Administration deposited around $78,000. At the time that the defendant withdrew the money from the account, there was only around $68,000. I'm sorry. There's no evidence that the defendant withdrew the money from the account, is there? Yes, Your Honor, there is. What is it, that she was standing there? The defendant told the case agent that she and her mother went to the bank. That she and her mother opened a joint account and that she and her mother withdrew the money from the account. Okay, fine. Where's the evidence that she withdrew the money? Your Honor, I believe her own statement. Her own statement didn't say that. I mean, it would be useful if you – the briefs were really not helpful in this regard because you may well have enough evidence, but to misstate the evidence doesn't help. And there was no evidence that she withdrew the money. There was evidence that she was there and that her mother – I mean, you have nobody saying she was – she and her mother were together talking to the bank agent to withdraw the money. Her mother signed everything. You have no direct evidence of what happened. And you have evidence that her mother opened a joint account and that she signed on as a joint signatory. But none of that demonstrates that she withdrew the money. I don't know what they get. I don't know if that's just positive, but we may as well start with the facts. Wasn't there on the next day a debit card that took three more withdrawals from the account? Yes, Your Honor. And that may be evidence that she had something to do with this, but there was no evidence that she withdrew the money. Your Honor, the facts are that the case agent testified on pages 948 and 249 of the excerpts of record that the defendant stated her and her mother, the defendant's mother and she, closed the grandmother's account. They withdrew the monies from the account. They opened a separate joint account, the defendant and her mother, into which they transferred their grandmother's money to her new account from the grandmother's account. Additionally, the defendant's signature was also on those opening papers for the joint account. I thought it was only on the signature card. Excuse me? I thought it was only on the signature card. The signature card for the joint account. And as Your Honor pointed out, the defendant later went and used her debit card. Now, we have this whole on or about argument. Is your ultimate argument that the crime itself was the withdrawal of the money the next day or that the withdrawal of the money the next day was evidence of her involvement in the withdrawal from the grandmother's account or what exactly? The evidence of the withdrawals the next day is evidence of her intent and her active participation in the crime that occurred on November 27th. Because at some point you seem to be saying that that itself could have been the crime. Your Honor, I believe that that could be a continuation of the crime in that she is, again, taking the money from the account. However, if she had not been actually present at the bank on the 27th, if she had not participated in the opening of the joint account, if she did not tell the case agent that she and her mother withdrew the money, then the conduct on the 28th alone would not have been sufficient. It is evidence of her intent and her active participation in the withdrawal. So you're not – because at some point you seem to be saying that because of the on or about instruction, it doesn't matter whether the crime occurred on the 27th, it could have occurred on the 28th. But you're not saying that. No, Your Honor. The crime that was charged and the way that the government presented or argued the crime to the jury was that the crime occurred on the 27th when the defendant went to the bank with her mother and they both withdrew all of the money from the grandmother's account. Could the activity on the 28th, even if she knew the source of this money, have been the crime or there's some suggestion that the – and I think the government agreed with this, that the crime, the theft itself had to end when they took the money out of the grandmother's account. Is that right? I don't believe the theft ended at that point in that the following day she withdrew the money to use it for her own benefit, so she made use of the money she stole. Would not the evidence that she knew she could withdraw it the next day as her own be some evidence of her intent the prior day in opening up the joint account? Yes, Your Honor. And agreeing to the transfer out of the account? Yes, Your Honor. And all of this evidence, all of the facts, including that the mother was the one who signed the small estate affidavit, that the mother was the one that signed the withdrawal slip, all of that was presented to the jury. So the jury could look at all of the evidence and decide which version of the facts it believed. And it concluded that it did believe that the defendant was at the bank with her mother actively withdrawing the money from the account. She was not a mere bystander. Does the Court have any other questions? No, that's fine. Thank you. Thank you. I'll give you one minute, Your Honor, if you want. You don't need to take it. Thank you, Your Honor. Just briefly, I want to address the issue of what the judge actually ruled on when he prohibited the defense from eliciting evidence that Kim had actually notified Social Security. There was an objection to one particular testimony. It's the government that extended that objection to an overwhelming objection to the question of whether Ms. Scobus notified the Social Security Administration, how one notifies Social Security Administration, and how notifications are recorded. So it was the government that made that the issue which the Court was asked to rule on. But if that's the case, and then the government stood up when Kim was on the stand and asked the question, weren't you told to notify the Social Security Administration, wouldn't trial counsel for Kim have jumped up and objected on the basis of this colloquy? Well, on this colloquy, the government repeatedly says they are going to elicit testimony that Kim was told to notify. They made it clear over and over again. They say, we are going to elicit this testimony that Citibank told Kim and Mary to notify the Social Security, and we are going to object on relevance grounds to whether Kim actually did notify Social Security. But doesn't a trial lawyer have a job in all this and say the logical consequence of Your Honor's ruling is that either both statements come in on Kim's testimony or the government can't ask Kim about this? He did that. He objected to the first ruling and explained to the Court, this is the impact. We need this evidence to show why Kim believed in November 2016 that there were no Social Security proceeds in the account. The Court says What page of the transcript are you on? Okay. I'm on 893 where the government says the question of whether Kim notified the SSA is no longer relevant. And defense counsel says, but they said in opening statement that Kim didn't notify it. I've got to be able to respond. And the Court says on 895, the objection on relevance grounds is sustained. Then on 895, defense counsel says, the reason I need this evidence is that if Kim reported that death, it makes it more likely that she believed she was entitled to the money because the money was in Social Security. There's a chain of inferences that come from that evidence. And then points to the fact that the government has already told the jury wrongly in opening statement that Kim didn't report the death to Social Security. And then on 896, the prosecutor says, yes, Your Honor, the government does intend to elicit Kim's statement that a Citibank employee told her to notify Social Security about Mary's death. Now, whether or not she did, in fact, call Social Security is not relevant. And the Court rules the objection is sustained. So that's two times. But he didn't agree that it wasn't relevant. I'm sorry. He didn't specifically agree that if she testified that the – specifically testified that she had told the Social Security, she wouldn't be allowed to do that. Well, I think that – this is the implication that the defense counsel took from it. I know. Because then he – three times the Court tells him, I ruled, because he's trying to explain the incredible relevance of this to Kim's defense. And wouldn't you have been entitled to a limiting instruction that that evidence is only relevant on the question of whether she knew there was Social Security money in the account, not that she had any obligation to report? Did anybody ask for such a limiting instruction? No, Your Honor. Okay. Thank you. Thank you, Your Honor. All right. Thank you very much. Thank both of you for your argument on United States v. Skovitz.
judges: Berzon, N.R. Smith, Castel